UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


OYD COLLINS McCRAY,

        Petitioner,

                                CASE NO. 03-73490

v.                                HONORABLE ARTHUR J. TARNOW

DOUGLAS VASBINDER,

        Respondent.

_____/

## OPINION AND ORDER DENYING PETITIONER'S RENEWED REQUEST FOR RELIEF FROM JUDGMENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b) AND GRANTING A CERTIFICATE OF APPEALABILITY

Petitioner Oyd Collins McCray was convicted of first-degree murder and possession of a firearm during the commission of a felony. He is serving a life sentence without the possibility of parole for the murder conviction. The state courts denied relief on direct and collateral review, and this Court ultimately dismissed Petitioner's habeas corpus petition for failure to comply with the one-year statute of limitations. Petitioner now seeks relief from the Court's order of dismissal on the ground that he is actually innocent of the crimes for which he is incarcerated and, therefore, the Court should excuse the untimeliness of his habeas petition and address the merits of his claims. The Court concludes for the reasons

that follow that Petitioner has not satisfied the gateway requirements for excusing his time-barred claims. Accordingly, the Court declines to grant relief from the order dismissing the petition as untimely.

## I. Background

## A. The State Court Proceedings

The facts leading to Petitioner's arrest and subsequent convictions have been summarized as follows:

> On September 28, 1994, Perry Leonard was shot to death while sitting in his Chevrolet Suburban on Bessemore Street in Detroit. Three days after the shooting, a witness identified Oyd McCray in a line-up as the gunman. Detroit police arrested McCray and charged him with first-degree murder, *see* Mich. Comp. Laws § 750.316, and with possession of a firearm during the commission of a felony, *see id.* § 750.227b.

> At McCray's trial, Eric Perrin, the witness who identified McCray, testified that he was driving on Bessemore Street sometime after 5:00 p.m. when he saw a brown Chevrolet Suburban truck stopped "in the middle of the street" blocking traffic. He observed a man standing by the driver's side window of the vehicle talking to the driver. About ten minutes later, Perrin testified, a blue car pulled up to the Suburban. The driver exited the car, "put his arm across the roof ... and looked toward the guy . . . in the Suburban. . . . And then when he did that, the [man standing by the driver's side window of the Suburban] started shooting the guy in the Suburban" through the open window, "just jerking the gun into the driver of the truck." Perrin described the gun as a silver, semi-automatic handgun.

In the midst of the shooting, Perrin continued, the Suburban began moving, veered left, jumped the curb and crashed into a house, and all the while the shooter "kept firing the gun, running alongside the vehicle." Perrin estimated that the shooter fired off "anywhere from five to ten shots." He next saw the shooter enter the blue car, and, fearing that he had seen "more than what [he] should have," Perrin "got out of there."

At a line-up three days later, Perrin fingered McCray as the shooter. At trial, Perrin admitted that he had not "noticed [McCray's] beard as profoundly at the time of the incident as [he] did in the line-up," but concluded that McCray was in fact the person he saw shoot and kill Leonard.

The State's second witness, Dartrell Effinger, testified that he was the driver of the blue car that pulled up to the Suburban. He observed McCray, whom he had known for a "[l]ong time," talking to Leonard, the driver of the Suburban. He got out of his car, greeted Leonard, then heard gunfire. He could not see McCray's hand because it was inside the driver's side window of the Suburban. After hearing gun shots, Effinger returned to his car and drove away. He denied that McCray and he left the scene together in his car and testified that he did not see Perrin's car stopped near the Suburban during the shooting. On cross-examination, Effinger acknowledged that he had told defense counsel that the shooter might have been McCray's brother, Stacy, who looked "very much" like McCray.

A county medical examiner testified that Leonard died from "massive internal bleeding" caused by multiple gunshot wounds and noted that he found "15 bullet tracks" in Leonard's body. The prosecution called several Detroit Police officers, who testified that Leonard was lying face-down in the Suburban with "blood spattered about the vehicle," and that the vehicle had bullet holes in the passenger door. Police tested the Suburban for fingerprints but did not recover any.

> McCray put on two witnesses, one of whom undermined his defense.
> Herbert Sanders, the attorney whom the court had appointed to ensure
> fairness at the suspect line-up, acknowledged that Perrin "was
> eventually able" to identify McCray as the shooter. Evelyn Ross, who
> lived in the home struck by Leonard's Suburban, testified that she did
> not see Effinger's or Perrin's car at the time of the shooting.

*McCray v. Vasbinder*, 499 F.3d 568, 569–70 (6th Cir. 2007) (internal citations to

the record omitted).

On August 16, 1994, Petitioner's jury found him guilty, as charged, of first-

degree murder and felony firearm. The trial court sentenced Petitioner to two

years in prison for the felony-firearm conviction and to life imprisonment for the

murder. Petitioner appealed his convictions and pursued state collateral remedies

without success.

## B. The Federal Court Proceedings

### 1. The Habeas Petition, Dispositive Opinion, Appeal, and Order on Remand

Petitioner commenced this action in 2003. He claimed in a *pro se* habeas

corpus petition that (1) there was insufficient evidence to support his convictions,

(2) the trial court violated his right to due process by refusing to allow the line-up

attorney to testify about the comments Perrin made during the line-up, and (3) new

evidence from Demarlo Gilbert would have resulted in a different verdict. The

4

State moved for summary judgment and dismissal of the petition on the basis that

Petitioner did not file his petition within the one-year statute of limitations for

habeas petitions. *See* Respondent's Mot. for Summary J. and Dismissal of Pet.,

Dkt. #5. Petitioner then raised several more issues in a supplemental brief (Dkt.

#15) and moved to dismiss the State's motion on the basis that he was innocent

(Dkt. #14).

The Court appointed counsel for Petitioner (Dkt. #16) and denied the

parties' motions without prejudice (Dkt. #29). On March 22, 2005, the Court held

an evidentiary hearing on whether the statute of limitations should be tolled for

Petitioner's claim of actual innocence. Petitioner and the following witnesses

testified at the hearing: DeMarlo Gilbert, Dartrell Effinger, Jermaine Hunter,

Ferrie Rice, Stacy McCray, Cynthia Bacon, and Derrick Ross. Following the

hearing, the Court determined that Petitioner had made a colorable showing of

actual innocence and that he was entitled to proceed with his claims. *See* Order,

Dkt. #36.

On February 13, 2006, the Court held a second evidentiary hearing on

whether Petitioner's trial counsel was ineffective for failing to investigate and call

additional defense witnesses. Petitioner's cousin, Johnny McCray, testified at the

hearing that he was gambling and shooting dice on Bessemore Street on the day of the shooting and that he saw the victim's Suburban arrive on the scene, followed by two cars. He did not observe the subsequent shooting, but he heard the gunshots and then ran away. He did not see Petitioner on the street or in either one of the two cars.

On September 14, 2006, the Court granted Petitioner a conditional writ of habeas corpus. The Court concluded that the outcome of the trial was undermined by defense counsel's failure to investigate and call certain individuals as witnesses and that the state court's rejection of Petitioner's claim about trial counsel was objectively unreasonable. *See* Op. and Order Granting the Writ, Dkt. #49. On August 28, 2007, the United States Court of Appeals for the Sixth Circuit reversed this Court's decision on the basis that Petitioner did not comply with the one-year statute of limitations, nor satisfy the gateway requirements for excusing a time-barred claim. *See McCray*, 499 F.3d at 569. On remand, this Court vacated its opinion and judgment granting the writ of habeas corpus and dismissed the habeas petition as time-barred. *See* Order Vacating the Judgment and Dismissing the Pet. as Untimely, Dkt. #64.

### 2. Petitioner's Motion for Relief from Judgment and Motion for Reconsideration

In 2008, Petitioner filed a motion for relief from judgment under Federal Rule of Civil Procedure 60(b). He claimed to have new evidence from Dante Effinger[1] that Eric Perrin was unsure of his pretrial identification of Petitioner and was improperly influenced by the police during the pretrial lineup. He requested an evidentiary hearing at which he could present testimony from Dante Effinger and an expert witness on eyewitness identification. *See* Mot. for Relief under Fed. R. Civ. P. 60(b), Dkt. #68.

The Court transferred Petitioner's Rule 60(b) motion to the Court of Appeals for the Sixth Circuit as a second or successive habeas petition. *See* Order, Dkt. #69. The Sixth Circuit, however, remanded the case to this Court after determining that Petitioner's actual-innocence claim was an attack on the Court's failure to reach the merits of his claims and, therefore, it was not a second or successive motion requiring authorization from the Court of Appeals. *See In re: Oyd McCray*, No. 08-1803 (6th Cir. Apr. 30, 2009) (unpublished). On remand, this Court denied Petitioner's motion for relief from judgment after concluding that

---

[1] Mr. Effinger's first name is also spelled "Donte" in the record. The Court is using the spelling that Mr. Effinger provided at the evidentiary hearing in this Court on June 27, 2017.

Petitioner's new evidence did not meet the gateway standard for establishing actual innocence.  *See* Order Denying Mot. for Relief from J., Dkt. #77.

Petitioner moved for reconsideration on the basis that the Court had failed to consider the numerous other witnesses who pointed to Dartrell Effinger as an accomplice and who indicated that Petitioner was not the shooter.  *See* Petitioner's Mot. for Reconsideration, Dkt. #78.  Petitioner attached three affidavits to his motion for reconsideration.

In the first affidavit, Dante Effinger states that he was in the pretrial lineup with Petitioner and that Perrin commented during the lineup that the person in position three (Petitioner) could be the shooter, but that he was not sure about his selection.  After the lineup, Perrin supposedly informed Dante that Perrin was not sure whether the person he had selected was the shooter, but that a police officer had told him the suspect he picked was, in fact, the shooter.  *See id.*, Attachment 3, Dkt. #78-3, PageID. 465.

In a second affidavit, Demetrus Smith states that Eric Perrin is his father and that in 1996 Perrin admitted to him that he (Perrin) testified against someone in a 1994 murder case even though he did not have the right person.  Perrin also allegedly told Smith that the police continued to tell him that he did have the right

person.  Smith goes on to say in his affidavit that he subsequently met Petitioner in prison and disclosed what his father had said to him.  *Id*., Attachment 4, Dkt. #78-4, PageID. 466.

In a third affidavit, Redrick Character states that he witnessed the shooting and that Petitioner was not the shooter.  According to Character, "Ant" was the person who fired into the victim's vehicle and was hanging onto the vehicle when it crashed.  A day or so later, "Trell" told Character that the incident was the result of some "beef" between "Ant" and the victim.  *See id*., Attachment 5, Dkt. #78-5, PageID. 467.

Petitioner asserted in his motion for reconsideration that the new affidavits, combined with the prior testimony, constituted sufficient evidence for the Court to make a finding of actual innocence and excuse his failure to comply with the statute of limitations.  The Court granted Petitioner's request for an evidentiary hearing on his motion for reconsideration, *see* Order, Dkt. #79, but later cancelled the hearing at Petitioner's request and denied Petitioner's motion for reconsideration without prejudice.  *See* Order, Dkt. #84.

### 3. The Third Evidentiary Hearing and Supplemental Briefs

In 2016, Petitioner returned to this Court and asked the Court to re-set the evidentiary hearing that was cancelled in 2011. *See* Petitioner's Request to Reset Date for Evidentiary Hearing, Dkt. #88. Attached to the motion were affidavits from Marcus McCray, Antanetta Bradford, and Dartrell Effinger. Marcus McCray states in an affidavit dated May 6, 2011, that he was on Bessemore Street on February 28, 1994, and that "Fat Cat," whose real name is Tony, was the only person he saw near the victim's Chevrolet Suburban that day. He heard gunshots, and after the shooting, he saw "Trell" pick up "Fat Cat" in a blue Chevrolet Malibu. He fled after the shooting because he had an outstanding warrant from the State of Indiana. He did not see Petitioner on the day of the shooting. *See id*., Ex. A, Dkt. #88-2, PageID. 787-88.

Antanetta Bradford (now Howze) states in an affidavit dated June 17, 2011, that in 1994, she was living on Bessemore Street when a shooting occurred. She heard several loud bangs and then saw a large brown truck crash into the house across the street. After the crash, she saw a man of medium height and build with a silver gun quickly walk away from the brown truck and get into the passenger's side of a blue car. As the car drove away, the occupants looked at her. She was

afraid after the shooting and never gave a statement to the police. In 2010, she learned from an acquaintance that "Bug" had been convicted of the murder. According to her, Bug was not the person she saw walking away from the brown truck on the day of the shooting. *Id*., Ex. B, Dkt. #88-3, PageID. 790-91.

Finally, Dartrell Effinger states in an affidavit dated September 13, 2010, that Anthony Jones, not "Bug," got in his car after the shooting. Dartrell goes on to say that he did not get a good look at the person standing by the victim's truck and that the reason he implicated Petitioner at trial was because detectives coerced him and made him fearful. *Id*., Ex. C, Dkt. #88-4, PageID. 793.

The Court granted Petitioner's request to re-set the evidentiary hearing, *see* Order, Dkt. #89, and on June 27, 2017, the Court held a third evidentiary hearing. Antanetta Bradford Howze testified at the hearing that she lived on Bessemore Street in 1994 and that she recognized Petitioner from the Bessemore neighborhood. She stated that she was on her porch on the day of the shooting and that she saw two cars, a blue one and a brown one. She saw a "chunky" (stocky) person about her color and height (5'5") shoot into a car and then get in the passenger side of another car. As the car backed up, the occupants looked at her.

Ms. Howze was shown a picture of Anthony Jones at the hearing and claimed that he was the shooter, not Petitioner.  She also testified that she did not tell the police about the incident because she was "scared."  Years later, she realized the importance of what she saw when a friend told her that someone's brother had gone to jail for the shooting.  Although the incident happened twenty-three years ago, she "it felt like yesterday" to her because she had never seen anything like that until then.  On cross-examination by the State, Ms. Howze reiterated that she actually saw the shooting, even though her affidavit states that she heard loud bangs and then looked to see what had happened.

Dante Effinger testified that he was arrested for the murder of Perry Leonard on March 2, 1994.  After being interviewed, he was locked up for a few days.  Then he was put in a line-up with "Bug" (Petitioner) and heard a man say, "I'm really not sure if that's him."  Someone else told the man, "That's him."  He was released after the line-up, but before he left the police station, a man approached him and said that he did not think the man he picked out of the lineup was the shooter.  About ten years later, Petitioner's sister contacted him about this information.

Redrick Character testified that he knew Petitioner from the Bessemore neighborhood and from school. On February 28, 1994, he was walking through a field to the store and saw a man run up to a tan truck on Bessemore and shoot into the truck. He knew the man as "Fat Cat." The man got into a blue car after the shooting and rode away. The shooter was not Petitioner. He (Mr. Character) agreed to testify in Petitioner's behalf after he was incarcerated and happened to speak about the case with another inmate who knew Petitioner.

Mr. Character stated that a booking photograph of Anthony Jones looked like "Fat Cat," the shooter. He did not know Fat Cat's real name, and although he stated in his prior affidavit that the shooter was "Ant," he did not know whether "Fat Cat" was also known as "Ant." On cross examination, Mr. Character testified that the portion of his 2009 affidavit which states that he learned about Petitioner's case from reading case law while incarcerated was false.

At the close of the hearing, the parties stated that they did not know where Anthony Jones was.[2] Petitioner submitted several exhibits, which were filed in this case a few days later. The exhibits consist of: the homicide file in Petitioner's case; Dante Effinger's statement to the police; the transcript of Petitioner's

---

[2] Eric Perrin also cannot be found, according to Petitioner's Supplemental Brief, Dkt. #99, p. 2, PageID. 1173.

preliminary examination; Anthony Jones' criminal history; and Anthony Jones' booking photograph. *See* Index of Exhibits, Dkt. #96.

Counsel for Petitioner subsequently filed a supplemental brief under Federal Rule of Civil Procedure 60(b) (Dkt. #99), and the State filed a brief in opposition to Petitioner's motion (Dkt. #100). Petitioner filed an additional supplemental brief through counsel on November 28, 2017. *See* Dkt. #101.

Petitioner maintains that the new and old evidence on which he relies establishes his innocence and provides a sufficient basis for overcoming the habeas statute of limitations. Petitioner asserts that, if he is not permitted to obtain relief, he will spend the rest of his life in prison for a crime that he did not commit.

## II. Legal Framework

Federal Rule of Civil Procedure 60(b) "allows a party to seek relief from a final judgment and request reopening of his case, under a limited set of circumstances," *Gonzalez v. Crosby*, 545 U.S. 524, 528 (2005), and for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). The provision on which Petitioner relies, Rule 60(b)(6), "is available only in 'extraordinary circumstances,' " *Tharpe v. Sellers*, 138 S. Ct. 545, 546 (2018) (quoting *Gonzalez,* 545 U.S. at 536); *see also Franklin v. Jenkins*, 839 F.3d 465, 472 (6th Cir. 2016) (noting that

"[r]elief under Rule 60(b) is the exception, not the rule" and that "a court may

grant relief 'only in exceptional or extraordinary circumstances' where principles

of equity 'mandate' relief"), *cert. denied*, 137 S. Ct. 2188 (2017). Exceptional and

extraordinary circumstances mandating relief under Rule 60(b)(6) " 'rarely occur'

in the *habeas* context." *Miller v. Mays*, 879 F.3d 691, 698 (6th Cir. 2018).

> Notwithstanding the extraordinary nature of relief under 60(b)(6),
> district courts may employ subsection (b)(6) as a means to achieve
> substantial justice when "something more" than one of the grounds
> contained in Rule 60(b)'s first five clauses is present. *See Federal
> Practice* § 2864, at 219–20. Accordingly, a motion made under Rule
> 60(b)(6) is addressed to the trial court's discretion which is
> "especially broad" given the underlying equitable principles involved.
> *Cf. Overbee v. Van Waters & Rogers,* 765 F.2d 578, 580 (6th Cir.
> 1985); *Matter of Emergency Beacon Corp.,* 666 F.2d 754, 760 (2d
> Cir. 1981).

*Hopper v. Euclid Manor Nursing Home, Inc.*, 867 F.2d 291, 294 (6th Cir. 1989).

The issue here is whether Petitioner's claim of actual innocence is a

sufficient basis for allowing him to bypass the statute of limitations and have his

claims heard on the merits. The Supreme Court has held "that actual innocence, if

proved, serves as a gateway through which a petitioner may pass whether the

impediment is a procedural bar, as it was in *Schlup* [*v. Delo*, 513 U.S. 298 (1995)],

and *House* [*v. Bell*, 547 U.S. 518 (2006)] or, as in this case, expiration of the

statute of limitations." *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013).

> *Schlup* makes plain that the habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial. Based on this total record, the court must make a probabilistic determination about what reasonable, properly instructed jurors would do. The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors.

*House*, 547 U.S. at 538 (quotation marks and citations omitted). The Supreme

Court, nevertheless, has cautioned

> that tenable actual-innocence gateway pleas are rare: "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup,* 513 U.S., at 329, 115 S.Ct. 851; see *House,* 547 U.S., at 538, 126 S.Ct. 2064 (emphasizing that the *Schlup* standard is "demanding" and seldom met). And in making an assessment of the kind *Schlup* envisioned, "the timing of the [petition]" is a factor bearing on the "reliability of th[e] evidence" purporting to show actual innocence. *Schlup,* 513 U.S., at 332, 115 S.Ct. 851.

*McQuiggin,* 569 U.S. at 386-87 (alterations in original).

# III. Analysis

Petitioner claims that the new and old evidence leads to the conclusion that he did not shoot the victim and, therefore, he has provided a sufficient basis for overcoming the one-year statute of limitations for habeas petitions. Petitioner argues that, no reasonable juror would have found him guilty beyond a reasonable doubt if: all the new witnesses had testified at trial regarding his absence from the crime scene and his whereabouts during that period; Dartrell Effinger had been confronted with his prior statement; defense counsel had challenged the propriety of the lineup; the line-up attorney had been allowed to testify about the tentative nature of Perrin's identification; and relevant portions of the homicide file had been introduced to impeach the prosecutor's narrative of the investigation.

## A. Petitioner, Stacy McCray, Cynthia Bacon, Ferrie Rice, Marcus McCray, Johnny McCray, Derrick Ross, Demarlo Gilbert, Jermaine Hunter, and Dartrell Effinger

Some of the testimony and affidavits on which Petitioner relies have already been considered and rejected by the Sixth Circuit Court of Appeals. In an opinion dated August 28, 2007, the Sixth Circuit stated that Petitioner's "affidavit and testimony that he was not on Bessemore Street at the time of the murder adds little in the way of quality to his actual-innocence claim." *McCray*, 499 F.3d at 573.

17

The Sixth Circuit noted that "[a] reasonable juror surely could discount his own testimony in support of his own cause." *Id*.

The Sixth Circuit rejected the testimony of Stacy McCray, Cynthia Bacon, and Ferrie Rice because they were members of Petitioner's family. The Sixth Circuit stated that they not only had a personal stake in exonerating Petitioner, "but they did not see the murder and have not provided a good explanation for why they took so long to come forward with evidence that their relation stands wrongly accused of murder." *Id*.

Petitioner's cousin Marcus McCray, whose affidavit is attached to Petitioner's request to re-set the third evidentiary hearing, and Petitioner's cousin Johnny McCray, who testified at the second evidentiary hearing, also have a personal stake in exonerating Petitioner. A reasonable juror, therefore, could have concluded that Petitioner's relatives were not worthy of belief. *See House*, 547 U.S. at 552 (noting that evidence from eyewitnesses with no apparent motive to lie would have more probative value than testimony from friends or relatives of the accused); *Cleveland v. Bradshaw*, 693 F.3d 626, 641 (6th Cir. 2012) (noting the risk of bias associated with affidavits made by close friends or relatives of the petitioner).

The Sixth Circuit discredited Derrick Ross, Demarlo Gilbert, and Jermaine Hunter because they did not see the shooting and, instead, witnessed the aftermath of the shooting or heard about it from other people. The Sixth Circuit stated that this deficiency made it impossible for those witnesses to refute Perrin's disinterested eyewitness testimony. *Id*. at 574.

As for Dartrell Effinger, the Sixth Circuit stated that reasonable jurors could question his recanting affidavit as an attempt to keep from being pegged as a rat for having originally identified Petitioner as the gunman. *Id*. at 574. The same thing is true of Dartrell's more recent affidavit in which he states that Anthony Jones, not Petitioner, got into his car after the shooting. Dartrell's recanting affidavits must be viewed "with extreme suspicion." *United States v. Chambers*, 944 F.2d 1253, 1264 (6th Cir. 1991), *superseded in part on other grounds by* U.S.S.G. § 2D1.5(a).

For the reasons given in the previous paragraphs, the Court is unable to conclude that no reasonable juror would have voted to find Petitioner guilty had the juror been aware of the testimony and affidavits of Petitioner, Stacy McCray, Cynthia Bacon, Ferrie Rice, Marcus McCray, Johnny McCray, Derrick Ross, Demarlo Gilbert, Jermaine Hunter, and Dartrell Effinger.

### B.  Antanetta Bradford Howze, Dante Effinger, Redrick Character, and Demetrus Smith

The remaining individuals in question are Antanetta Bradford Howze, Dante Effinger, and Redrick Character, who testified at the evidentiary hearing in 2017, and Demetrus Smith who signed an affidavit on August 24, 2009.

### 1.  Antanetta Bradford Howze

Ms. Howze's testimony in all likelihood would not have convinced a reasonable juror to acquit Petitioner because, even though she claimed to remember the shooting as if it were yesterday, she appeared to have a problem remembering the incident at the evidentiary hearing, and her testimony was not consistent with her prior affidavit.  Although she insisted at the evidentiary hearing that she observed the shooting, *see* 6/27/17 Mot. Hr'g Tr. at 11-16, Dkt. #97, PageID. 1145-50, she stated in her 2011 affidavit that she heard several loud bangs and then saw a large brown truck crash into a house across the street.  *See* Request to Reset Date for Evidentiary Hearing, Ex. B, Dkt. #88-3, PageID. 790.

Howze's description of the shooter at the hearing also contradicted her affidavit.  At the hearing, she stated that the shooter was 5'5" tall or shorter and "chunky," *see* 6/27/17 Mot. Hr'g Tr. at 12, 16, PageID. 1146, 1150, but in her

earlier affidavit, she said the shooter had a medium height and medium build. *See* Request to Reset Date for Evidentiary Hearing, Ex. B, Dkt. #88-3, PageID. 790. Although she was shown a photograph of Anthony Jones at the hearing and claimed that he was the shooter, it appears that she never before identified Jones as the shooter, and her testimony at the hearing was twenty-three years after the crime.

Furthermore, Howze's description of the shooter as 5'4" or 5'5" and 150 to 160 pounds, *see* 6/27/17 Mot. Hr'g Tr. at 16, Dkt. #97, PageID. 1150, did not match Jones, who was 5'8" and 265 pounds at the time of the crime. *See* Respondent's Supplemental Brief in Opp'n to Relief from J., Ex. A, Dkt. #100-1, PageID. 1233. Howze's description of the shooter is closer to Petitioner's height (5'6") and weight (165 pounds) after the crime. *See id*., Ex. B, Dkt. #100-2, PageID. 1235. Howze's description also is similar to Derrick Ross's description of the shooter (5'6" and 145 pounds), as well as, Perrin's description of the shooter (5'7", 145-160 pounds). *See id*., Exs. C and D, Dkt. #100-3 and #100-4, Page ID. 1238 and 1240.

## 2. Dante Effinger

Dante Effinger testified at the Court's third evidentiary hearing that he was in a line-up with Petitioner and that, after the line-up, a man approached him and said that he picked someone out of the line-up, but he did not think the person was the shooter.  *See* 6/27/17 Mot. Hr'g Tr. at 21-22; Dkt. #97, PageID. 1155-56. Although the State argued at the evidentiary hearing that Dante's affidavit and testimony were inadmissible hearsay, the Court rules that the evidence is admissible, because when making a determination on a claim of actual innocence, a habeas court is required to "consider all the evidence . . . without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial."  *House*, 547 U.S. at 538 (quotation marks omitted).

Dante's testimony, however, in all likelihood would not have convinced a reasonable juror to find Petitioner not guilty for two reasons.  First, it is unlikely that an eyewitness would have contact with someone who was in a line-up and then tell the person who was in the line-up, but not the police, that he did not think he picked the right person.  Second, it strains credulity that, although Dante knew Petitioner, he did not think the eyewitness's comment was important.  Further, he waited more than a decade after the lineup to sign an affidavit explaining what the

eyewitness allegedly said to him. Affidavits collected long after the crime to prove a petitioner's innocence "are to be treated with a fair degree of skepticism." *Herrera v. Collins*, 506 U.S. 390, 423 (1993) (O'Connor, J., concurring).

### 3. Redrick Character

Redrick Character's affidavit and testimony also must be viewed skeptically due to his delay in coming forward with information. Additionally, his testimony and affidavit are inconsistent. Character wrote in his affidavit, which was signed on October 28, 2009, that he was on Bessemore Street "hustling and shooting dice" on the day of the shooting and that he heard gunshots shortly after he saw "Ant" approach the victim's truck. *See* Petitioner's Mot. for Reconsideration, Ex. 5, Dkt. #78-5, PageID. 467.

He testified at the Court's evidentiary hearing that he did not "hang out" on Bessemore Street in 1994 and that he would merely walk through there on his way to the store. He also claimed that he saw someone known as "Fat Cat" run up to the victim's truck and shoot and then leave in a blue car. Mr. Character identified a photograph of Anthony Jones as the shooter, but he did not know whether "Fat Cat" was also known as "Ant." *See* 6/27/17 Mot. Hr'g Tr. at 24-29, Dkt. #97, PageID. 1158-63.

### 4. Demetrus Smith

Demetrus Smith did not testify at any of the evidentiary hearings, but he signed an affidavit in 2009 in which he wrote that Eric Perrin was his father and that Perrin once admitted to him that he testified for the prosecution in a 1994 murder case even though he knew the police did not have the right person. Perrin also supposedly told Smith that the police kept telling him in 1994 that he did have the right person. *See* Petitioner's Mot. for Reconsideration, Ex. 4, Dtk. #78-4, PageID. 466.

A reasonable juror would not find Smith to be credible because he claims that he just happened to meet Petitioner in prison and then realized that Petitioner was the man his father had falsely accused. It also strains the imagination to think that Smith was willing to admit to Petitioner that his father had falsely accused Petitioner, but he apparently never notified law enforcement authorities about his father's admissions.

For the reasons given above, the Court cannot conclude that no reasonable juror would have found Petitioner guilty beyond a reasonable doubt if they would have had the testimony or affidavits of Antanetta Bradford Howze, Dante Effinger, Redrick Character, and Demetrus Smith.

### C. Other Evidence

Having concluded that Petitioner's witnesses would not have made a difference in the trial, the Court now examines the other evidence on which he relies. He points to the homicide file, which he claims would have been helpful to the defense because it included (1) photographs taken of Petitioner, Dartrell Effinger, Dante Effinger, and Anthony Jones at the police station, (2) a photograph of the lineup, (3) statements from the victim's family, (4) a note about an anonymous tip, which implicated Petitioner and someone named Dante, (5) Dante Effinger's statement to the police following his arrest, (6) Dartrell Effinger's and Anthony Jones' witness statements, and (7) various reports about the investigation.

### 1. False Leads

Petitioner contends that the homicide file contains "false leads," including an anonymous tip that "Bug" and a man named Dante were involved in the shooting. *See* Petitioner's Index of Exhibits, Dkt. #96-1, PageID. 868. Dartrell Effinger, however, informed a police officer a few days after the shooting that Bug's real name was Oyd McCray, that Bug's right hand was inside the victim's truck window when the shots were filed, and that Bug ran off after the shooting. Dartrell

also informed the officer that he had heard Bug owed the victim some money.  *See id*., PageID. 1015.

Anthony Jones told the police that when he first saw Bug, Bug was standing at the driver's door to the Suburban and talking to the victim.  According to Jones, the victim said to Bug, "If I don't get the title to the BMW signed over to me by the end of the day I will kill you."  Jones walked across the street and then heard some shots and saw Bug hanging onto the Suburban.  One of Bug's hands was inside the window when Jones heard more shots.  He also heard Bug say, "I told you I was going to kill you."  *Id*., PageID. 1020.

Given Effinger's and Jones' statements to the police, a reasonable juror could have concluded from the homicide file that the anonymous tip about Petitioner was not a false lead.

The other "false lead" that Petitioner mentions in his supplemental brief is a witness statement from Kathleen Parrish, the victim's girlfriend.  She informed an officer that Petitioner sold drugs for the victim and that she heard from one of the victim's relatives that Petitioner owed the victim some money.  *Id*., PageID. 865.  Contrary to Petitioner's allegations, this was not necessarily false information simply because it was based on hearsay or because the victim's family member

was never interviewed. Further, the fact that Petitioner owed the victim some money was corroborated by Dartrell Effinger's statement to the police.

## 2. The Lineup

Petitioner alleges next that the homicide file shows evidence of a suggestive lineup. While it is true that the seven men in the line-up ranged in height from 5'6" (Petitioner) to 6'0", and their weights ranged from 145 to 220 pounds, *see id.*, Page ID. 937, it does not appear that Perrin picked Petitioner out of the lineup due to any suggestiveness in the lineup. In fact, he apparently hesitated before picking Petitioner out of the lineup. *See* 8/16/94 Trial Tr. at 65, Dkt. #20, PageID. 678 (the lineup attorney's testimony that "the witness was *eventually* able to make an identification of this individual") (emphasis added). Had the lineup been unnecessarily suggestive, Perrin in all likelihood would have picked Petitioner immediately. Furthermore, there is no evidence that the lineup administrator tainted Perrin's identification of Petitioner by steering Perrin's attention to Petitioner. The jury, moreover, was made aware that Perrin tentatively identified Petitioner at the lineup by stating that the third man (Petitioner) "could be the shooter" and "look[ed] like him." *See* 8/15/94 Trial Tr. at 77-79, Dkt. #19, PageID. 544-46.

It cannot be said that, no reasonable juror would have found Petitioner guilty beyond a reasonable doubt if additional information about the lineup had been provided to the jury.

### 3. Dartrell Effinger's and Anthony Jones' Statements to the Police and the Transcript of Petitioner's Preliminary Examination

Petitioner points to evidence in the homicide file that indicates Anthony Jones got in Dartrell Effinger's car after the shooting. Dartrell Effinger, for example, informed the police in his witness statement that Tony Jones got into his car after the shooting and that Petitioner ran off into a vacant field. *See* Index of Exhibits, Ex. 1, Dkt. #96-1, PageID. 1015. Anthony Jones also informed the police that he got in Dartrell Effinger's car after the shooting, and he stated that he lost sight of Petitioner. *Id.*, PageID. 1020. Jones also testified at Petitioner's preliminary examination that he got in Effinger's car after the shooting. *See id.*, Ex. 2, PageID. 1094. Petitioner concludes from this evidence and from the testimony of other witnesses, including Perrin, who said that the shooter got in Effinger's car after the shooting, that Anthony Jones was the shooter, not Petitioner.

It is possible, however, that both Petitioner and Anthony Jones got in Dartrell Effinger's car after the shooting. A reasonable juror, moreover, could

have concluded from Effinger's and Jones' witness statements that they were trying to avoid being viewed as accomplices to a murder when they stated that Petitioner disappeared after the shooting. Furthermore, Petitioner matched Perrin's and Derrick Ross's description of the shooter, whereas Jones did not. Jones was at least 100 pounds heavier than the shooter. *See infra*, section III.B.1.

The Court cannot conclude that no reasonable juror would have found Petitioner guilty beyond a reasonable doubt if they would have had the homicide file.

## IV. Conclusion

Petitioner has not persuaded the Court that, in light of all the new evidence and the evidence produced at trial, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt. Therefore, he has not made a credible showing of actual innocence sufficient to excuse his failure to file a timely habeas petition and to justify relief from judgment. Accordingly, Petitioner's supplemental requests for relief under Rule 60(b) are denied. The Court nevertheless grants a certificate of appealability on Petitioner's supplemental requests for relief from judgment, because reasonable jurists could conclude that

Petitioner's claim of actual innocence warrants encouragement to proceed further.

*Miller-El v.Cockrell,* 537 U.S. 322, 327 (2003).


         s/Arthur J. Tarnow
         ARTHUR J. TARNOW
         SENIOR UNITED STATES DISTRICT JUDGE

Dated: August 17, 2018